IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

## STATE OF TENNESSEE v. DEANDREY PETERSON

**Appeal from the Criminal Court for Shelby County**
No. 14-04006        Paula L. Skahan, Judge

_____

### No. W2016-01878-CCA-R3-CD

_____

The Defendant, Deandrey Peterson, appeals his convictions for aggravated rape, aggravated robbery, aggravated burglary, and possession of a firearm with the intent to go armed during the commission of a dangerous felony, and his effective thirty-year sentence. The Defendant contends that the evidence is insufficient to support his convictions and that the trial court violated Tennessee Rule of Evidence 404(b) in admitting evidence of other offenses. We affirm the Defendant's convictions but remand the case to the trial court for a new sentencing hearing for the firearm conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in
Part; Reversed in Part; Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Robert Brooks (on appeal) and Charles W. Gilchrist, Jr., (at trial), Memphis, Tennessee, for the appellant, Deandrey Peterson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented at trial established that during the early morning hours of March 27, 2014, the Defendant broke into the victim's apartment, raped her multiple

times, and took money and an iPad. On March 26th, a dog that the victim had been watching for a friend barked throughout the evening, and the victim and her young daughter slept in the victim's bedroom with the door closed to drown out the dog's barking. The victim testified that at approximately 2:30 a.m., she awoke when the dog's barking became "uncontrollable." The victim walked out of her bedroom and into the kitchen where she saw a man holding a gun. The man pointed the gun at her and asked her where money and "kush" were. The victim denied having any knowledge of money or "kush."

The victim testified that the man had "really bright brown eyes" that were "distinct" and had "kind of a brownish black look." The victim described the man as skinny, African-American, and five feet, seven inches, or five feet, eight inches tall and said he was wearing dark clothing, a "skully hat," and a hood over his hat. She identified the Defendant as the perpetrator both at trial and in a photographic line-up following the offenses.

The Defendant instructed the victim to return to the bedroom where her daughter was crying. The Defendant followed the victim to her bedroom while pointing the gun at her. He instructed the victim to get into the bed with her daughter and to cover their heads with the sheets, and the victim did as instructed. He took the victim's cellular phone and removed the battery. He left the bedroom for ten to fifteen minutes, during which time the victim could hear the Defendant moving around items in either the living room or the kitchen.

When the Defendant returned to the bedroom, he instructed the victim to come with him to the living room and to leave her daughter in the bedroom. He threatened to hurt the victim's daughter if the victim did not ensure that her daughter remained quiet. The victim told her daughter to be quiet and remain in the bedroom until the victim returned. As the victim and the Defendant were walking into the living room, the Defendant said he knew someone had been to the victim's apartment earlier because his friend told him that he saw someone come to the apartment with a large bag. The victim denied having any knowledge of the Defendant's claims. She testified that based on the Defendant's comments, she believed that the Defendant had been watching her because her friend had brought the dog to her apartment in a large bag.

While in the living room, the Defendant began touching the victim's chest and her body while making statements such as, "you are so fine" and "you shouldn't be by yourself like this." Although the lights were not on inside the apartment, a bright outside light was shining into the apartment, and the victim was able to see the Defendant's figure and his dark clothing. She said she was too scared to pay attention to the details of

the Defendant's clothing, but she observed that the top portion of the Defendant's gun was silver.

The Defendant instructed the victim to sit on the couch, and she did so. He spoke to her for approximately five minutes, asking her multiple personal questions such as whether she was married. He instructed the victim to remove the pajama pants that she was wearing, and he used them to cover the victim's face like a mask and tied them around her head. The Defendant asked if he could perform oral sex on the victim and then performed oral sex on her without her consent. The victim stated that although she did not know how long it lasted, it appeared to last a long time. The Defendant removed the covering from his face while performing oral sex on the victim.

The Defendant covered his face, removed the pants from around the victim's eyes, and instructed her to stand up and bend over. He then raped her vaginally while wearing a condom. He instructed her to get onto the couch where he raped her vaginally again. He then went into the bathroom and cleaned himself. He instructed the victim to wipe herself off in the bathroom and to bring him the towel that she used. After cleaning herself in the bathroom, the victim brought the Defendant a blue towel, which he put in his pocket.

After hearing the victim's daughter crying from the bedroom, the Defendant instructed the victim to go tell her daughter to be quiet and to return with a condom. The victim did so and returned to the living room. The Defendant asked the victim whether she had any other cellular phones and whether she had any nude photographs on her cellular phone, and the victim responded that she did not. The Defendant directed the victim to the kitchen by the washing machine, placed his gun on top of the refrigerator, and vaginally raped the victim while using a condom.

When they returned to the living room, the Defendant showed the victim an application on his cellular phone with a radio transmitter that allowed him to hear any calls to the police. He told the victim multiple times that if she called the police, he would return and kill her and her daughter. The victim told him that she would not call the police and would go to her parents' house. She testified that the Defendant appeared afraid to leave because he did not know whether she could call the police. The Defendant asked the victim where her husband was because she had told him that she was married, and she told him that her husband was not there. As the Defendant was about to leave, he told her that he would bring her a gun so that she would be safe. He asked the victim for her telephone number. The victim testified that she gave it to him in the hope that it would assist officers in locating the Defendant if he called. The Defendant returned the victim's cellular phone and battery and took $200 from the victim's purse and her daughter's iPad. He hugged the victim in a "romantic" way and left the victim's

apartment around 4:30 or 4:45 a.m. while wearing the victim's black and gold Chanel scarf around his face.

After the Defendant left, the victim called her mother and told her that she had been raped. The victim asked her mother to not call the police because the Defendant would be able to hear the call. The victim and her daughter left the apartment, and the victim drove to a nearby convenience store where she flagged down a police officer.

The victim testified that approximately one or two months prior to the attack, she met a man at a convenience store who had a distinctive voice and sounded like the same man who attacked her. She spoke to the man for five or ten minutes and gave him her telephone number. The man called the victim later that day, and she spoke to him for fifteen to twenty minutes but decided that she was not interested in him. However, the man continued to call her about twenty times that same day. The victim told the man that they could not talk because she was married and lived with her husband. The man did not call her after that. One day, the man showed up at the victim's apartment and asked her out for a date, and she declined. The victim stated that she had not told the man where she lived. The man told her where he lived, and the victim testified his home was within walking distance of her apartment.

The victim said her attacker and the man who she met at the convenience store had the same voice and eyes. She stated that her attacker acted as if he had never met her and that she did not realize who he was while he was in her apartment. After the victim contacted the police, she realized that her attacker was the same man from the convenience store. She informed Sergeant Jashub Israel that she believed that she recognized the attacker's voice as the voice of a man whom she had met at a convenience store, and she gave a description of the man. The victim testified that she was "one hundred percent sure" that the man from the convenience store was the same man who raped her. She stated that when she identified the Defendant as her attacker in a photographic line-up, she also recognized him as the man from the convenience store and wrote on the line-up that "[b]ased on the guy's eyes and his voice[,] this is the same person from the gas station I met one month ago."

An officer later showed the victim a photograph of a gun, which the victim testified appeared to be the gun that the Defendant pointed at her. The victim recalled that the Defendant had a white Galaxy smart phone and identified a photograph of what the victim stated appeared to be the Defendant's cellular phone.

On cross-examination, the victim acknowledged that while the gun and telephone matched the perpetrator's gun and telephone, she could not be certain they were the same. The victim stated that her apartment was dark and that the only light that was coming into

- 4 -

the apartment was in the kitchen. When she initially saw the Defendant in her apartment, she was not paying attention to his hands or body but was focused on his gun. The Defendant was not wearing gloves, and the victim did not notice any tattoos on his hands. He was wearing a hoodie, and his face was covered so that the victim could only see his eyes. The victim did not notice any scars on the Defendant and did not recall him having any hair on his chest. Although the victim recalled that the Defendant was wearing dark clothing, she never saw the type of clothes that he was wearing. The victim stated that her mother had purchased the scarf that the Defendant had used to cover his face in Chicago and that she had never seen a similar scarf in Memphis.

On redirect examination, the victim testified that the light shining into her apartment was sufficient to allow her to see the Defendant's eyes. The State requested that the trial court require the Defendant to make a statement to allow the victim to identify the Defendant's voice. The trial court granted the State's motion, and the Defendant stated, "My name is Deandrey Peterson. I'm from Memphis, Tennessee." The victim testified that she recognized the Defendant's voice as that of her attacker.

The victim's mother testified that after 5:00 a.m. on March 27, 2014, the victim called her and told her of the attack. The victim was crying and afraid, and the victim's daughter was crying and screaming in the background. The victim's mother instructed the victim to leave the apartment with her daughter, and the victim's mother said she would call the police. The victim's mother testified that the victim stated that her attacker had warned her that he had an application on his cellular phone that allowed him to listen to all calls to the police. The victim's mother then went to a service station where she saw the victim speaking to a police officer.

The victim's mother testified that she had previously purchased a black and yellow Chanel scarf for the victim during a trip to New York in early 2014. The victim's mother identified the scarf at trial but acknowledged that the scarf was not one of a kind.

Officer Issac Coleman of the Memphis Police Department testified that the victim flagged him down at a convenience store while he was on patrol at approximately 5:20 a.m. The victim reported that at approximately 2:45 a.m., she was raped and robbed at her residence. Officer Coleman recounted the victim's summary of the attack, which was consistent with her testimony at trial. He stated that the victim described her attacker as an African-American man, who was around five feet, six inches or five feet, seven inches tall with a slim build and was wearing a black hat, a black coat, blue jeans, and a black and gold scarf around his face.

Sergeant Jashub Israel testified that before he showed the victim a photographic line-up, the victim told him that she recognized the perpetrator's voice as if she knew him

or had met him at some point. The victim also stated that the perpetrator's eyes looked familiar. She said that if she heard the perpetrator's voice, she would be able to recognize him. An investigator prepared a photographic line-up based on the victim's recollection of the perpetrator's eyes. The victim identified the Defendant in the photographic line-up as the perpetrator and as someone whom she had met at a convenience store approximately one month before she was attacked.

Sergeant Willie Mathena testified that on March 27, 2014, he and his team received information that video surveillance showed a sports utility vehicle (SUV) leaving the apartment complex where the victim lived following the rape. Sergeant Mathena and other officers began looking for SUVs in the area and located a Ford Explorer with a smart cellular phone inside the vehicle. The Ford Explorer was parked outside the apartment of Ms. Henson, the mother of the Defendant's children. The officers arrested the Defendant at around 9:45 or 9:55 a.m. as he was about to enter the Explorer. Crime Scene Officer Anthony Barbarotto processed the Ford Explorer and located multiple cellular phones in the vehicle, including a cellular phone that the victim identified at trial as similar to the cellular phone that the Defendant showed her on the night of the attack.

Ms. Kristine Gable, the nursing coordinator at the Rape Crisis Center, collected swabs from the Defendant, including swabs from his penis, his pubis, his beard and facial area, and his scrotum. Officer Barbarotto photographed the Defendant and collected his clothing. Officer Barbarotto located $186 in cash rolled up tightly in the band of the Defendant's pants. On cross-examination, Officer Barbarotto testified that the Defendant appeared to have multiple tattoos on the backs of both hands and scars on his arms. The Defendant also had noticeable hair in the area of his stomach.

Crime Scene Officer Michael Coburn processed Ms. Henson's apartment where the Defendant had been staying. He found a gold and black scarf on the Ms. Henson's couch, which the victim's mother identified at trial as the scarf that she had given the victim. He also located multiple cellular phones, tablets, and other electronic devices in the closet of the master bedroom. Officer Coburn found a black and silver .40 caliber pistol in the nightstand of the bedroom. It was the same gun that the victim identified at trial as appearing to be the gun that the Defendant pointed at her during the attack. The gun had one round in the chamber and thirteen live rounds in the magazine. Officer Coburn located a box of Winchester .40 caliber ammunition containing thirty-one live .40 caliber rounds behind the television in the master bedroom and an empty fifteen-round SR .40 caliber magazine that could have fit the gun.

Ms. Phyllis Crump, a family nurse practitioner at the Rape Crisis Center, was accepted by the trial court as an expert in the areas of sexual assault and forensic sexual

assault examinations. She conducted an examination of the victim on the morning of March 27th and described the victim as "kind of broken and crying and a little quiet at times." The victim provided a summary of the attack which was consistent with her testimony at trial. Ms. Crump did not observe any injuries on the victim's body or during the vaginal examination. Ms. Crump explained that the lack of injuries was common because the vaginal area is pliable. She also collected a rape kit. The victim reported that she had urinated since the assault and before the rape kit was collected, which Ms. Crump explained could have resulted in any secretions being wiped away.

Tennessee Bureau of Investigation Special Agent Donna Nelson, the crime laboratory director in Memphis and a forensic scientist with the forensic biology unit, was accepted by the trial court as an expert in the areas of forensic serology and DNA. Special Agent Nelson tested evidence that was submitted to the laboratory by a police officer and was received by someone in the evidence receiving unit. The evidence was sealed before she began examining it.

Special Agent Nelson's tests of the victim's vaginal and vulvar swabs from the rape kit were negative for sperm. She explained that sperm generally would not be found if a condom was used during the sexual assault. She also examined a stain in the victim's underwear. Due to the limited value of the DNA profile obtained, the results regarding the victim's DNA were inconclusive. The Defendant was excluded as a contributor.

The DNA profile obtained from the swab of the Defendant's face and beard matched the Defendant. The DNA profile obtained from the Defendant's scrotum swabs was consistent with a mixture of at least two individuals. However, the results regarding the victim's DNA were inconclusive.

The DNA profile obtained from the Defendant's pubis swabs was consistent with a mixture of at least two individuals. Special Agent Nelson concluded that the DNA of both the victim and the Defendant were present in ten of the fifteen different loci of the DNA profile and in the gender marker. All other loci were inconclusive due to insufficient and/or degraded DNA. Special Agent Nelson also examined the information that was below the reporting threshold to determine whether it was consistent with the DNA profiles of the Defendant and the victim and noted an additional piece of information that was present at one of the fifteen locations. She stated that sexual contact between two individuals would be consistent with obtaining a mixture in a DNA profile.

Special Agent Nelson entered the information from the DNA profile into the Federal Bureau of Investigation's (FBI) statistics database and determined that the probability of randomly selecting an unrelated individual as the contributor of the DNA mixture profile was 1 in 26,420 for the African-American population, 1 in 349,700 for

the Caucasian population, and 1 in 114,400 for the Southwestern Hispanic population. She stated that she could expect this event to occur again in 1 in 26,800 sets of two people contributing their DNA profile to a sample.

The DNA profile that Special Agent Nelson obtained from the Defendant's penile swabs was consistent with a mixture of at least two individuals, one of whom was the Defendant. The profile was consistent with that of the victim in six of the fifteen loci plus the gender marker. All other loci were inconclusive due to insufficient and/or degraded DNA. Special Agent Nelson testified that the "probability of just the six areas that I saw the victim of randomly selecting an unrelated individual with the same DNA profile" was approximately 1 in 6,662,000 for the African-American population, 1 in 21,780,000 for the Caucasian population, and 1 in 14,799,00 for the Southwestern Hispanic population. Special Agent Nelson stated that DNA could be transferred even if a condom was used because condoms do not always prevent fluid from moving through the barrier.

On cross-examination, Special Agent Nelson testified that even though mistakes can occur, the laboratory has implemented checks and balances to help prevent such mistakes. She utilized the protocol manual that led her through each step of the testing process and took precautions to prevent contamination during the handling of the evidence. She took two proficiency tests each year and had never made a mistake on a test to her knowledge.

Special Agent Nelson defined the stochastic threshold as the level that the DNA must reach to allow her to be certain that all information for a particular individual is present in the sample. She stated that results were not obtained from five loci on the DNA profile from the Defendant's pubis swabs due to the absence of sufficient DNA. However, she examined the five loci to ensure that they were consistent with being from the Defendant and the victim.

Special Agent Nelson testified that she believed that the DNA of at least two individuals was present in the Defendant's penile swabs. She acknowledged that the sample could possibly include the DNA of more than two individuals and that she was only able to obtain a DNA profile in six of the fifteen loci. She explained that it was not uncommon in forensic case work to obtain a partial profile where a DNA profile is not obtained in all fifteen loci and the gender marker. However, she examined the information below her reporting threshold to ensure that it was consistent with the DNA coming from both the victim and the Defendant. She acknowledged that she could not determine the time, place, or circumstances under which the DNA evidence was left on the items tested.

Ms. Henson, the mother of the Defendant's children, testified that in 2014, the Defendant visited her apartment to see their children and slept on the couch. On the evening of March 26, 2014, Ms. Henson drove the Defendant to her apartment in her Ford Explorer. The Defendant and their daughters watched a movie, after which Ms. Henson put their daughters to bed. Ms. Henson went to bed shortly after midnight in her bedroom, while the Defendant remained in the living room.

Ms. Henson testified that around 4:00 a.m. or "4-something," she got up with one of her daughters. She stated that when she came out of the bathroom, she saw the Defendant on her couch in the living room. She also stated that the Defendant was at her apartment when she awoke around 7:00 a.m. After the Defendant helped their daughters get ready for school, he and Ms. Henson took them to school, and the Defendant drove Ms. Henson to work. Ms. Henson maintained that the Defendant did not leave her apartment in the middle of the night. She explained that she would have heard him had he left because her door was loud and squeaky and she was a light sleeper. She denied telling others that she was unsure of whether the Defendant was at the apartment for the entire night.

Ms. Henson testified that the Defendant had a gun with him when she brought him to her apartment and that he gave it to her for protection due to the series of rapes that had been occurring in the area. Ms. Henson did not know where the Defendant got the gun. She stated that the gun was under her couch and that she moved it to her bedroom because she did not want her daughters to find it. She identified a photograph of the gun, which the victim had testified appeared to be the same gun used by her attacker. Ms. Henson acknowledged that she told police officers that the Defendant had to have placed the gun in the bedroom drawer where the officers located it because she did not own a gun. She also told officers that she last saw the gun in February 2014. She denied lying to the officers and explained that she was "hysterical" and "wasn't thinking."

Ms. Henson stated that she and the Defendant had discussed the gun since her statement to the police. The Defendant told her that he planned to claim that the gun belonged to her and deny that the gun was his. However, Ms. Henson testified that the gun belonged to the Defendant.

Ms. Henson stated that she did not see the Defendant with a white cellular phone when she drove him to her apartment. She said that while the Defendant had cellular phones at her apartment, they did not work and that the Defendant used them to play music. Ms. Henson also said she did not own a gold Chanel scarf and did not see a scarf when she left her apartment on the morning of March 27th. She acknowledged that the Defendant owned a skull cap. On cross-examination, Ms. Henson testified that the Defendant had tattoos on both hands.

- 9 -

Sergeant Ouita Knowlton testified that when he interviewed Ms. Henson on March 27th, she denied that the gun found in her apartment belonged to her and maintained that she did not like guns. She maintained that the Defendant had to have placed the gun in the drawer where officers located it. She told the officers that when the Defendant had the gun, he would put it in between the cushions of the couch where he slept when he visited. She stated that she did not like the Defendant storing the gun in the cushions because children lived in the home. She also stated that while the Defendant did not live with her, he had been staying there more frequently because she was afraid after reports of a rapist in the area.

Ms. Henson told Sergeant Knowlton that the Defendant was at her apartment on the night of March 26th when she went to bed and that he was still there when she awoke during the early morning hours to address an issue with her daughter. She also told the officer that she did not know whether the Defendant left that night. On cross-examination, Sergeant Knowlton acknowledged that Ms. Henson told him that she went to bed around midnight and that when she woke up around 4:00 a.m., she saw the Defendant sleeping on the couch.

The Defendant presented the testimony of Dr. Ronald Action, a retired professor in the Department of Medicine, Microbiology, Genetics, and Epidemiology at the University of Alabama, who the trial court accepted as an expert in the fields of forensic serology and forensic DNA. Dr. Action agreed with Special Agent Nelson's conclusions with the exception of her conclusions regarding the pubis and penile swabs. He stated that the DNA tests did not include any information regarding the time, place, and circumstances under which the DNA was left on the evidence.

Dr. Action testified that the pubis swab contained a mixture of DNA and that with a mixture, it could not be conclusively determined that a particular person contributed his or her DNA to the mixture. Rather, only a possibility that the person was a contributor exists, and other possibilities are available. He stated that the fact that loci below the stochastic threshold cannot be interpreted meant that those alleles are not reliably found in the victim. He opined that as a result, the data is inconclusive.

Dr. Action opined that the Defendant was excluded as a contributor to the mixture on the penile swab even though the swab was of his body because some of his genes were not detected on the swab. Dr. Action believed that the failure to obtain results on all 16 loci and the gender loci indicated an issue with the test itself and that, thus, the results of the test were inconclusive.

On cross-examination, Dr. Action testified that he believed only someone with a doctoral degree or the equivalent training had the background to correctly interpret the

results of a DNA test. He stated that Special Agent Nelson was not qualified as a scientific expert under The College of American Pathologists and could only be a technician. He acknowledged that his opinion was based on a scientific standard and not a legal standard.

Dr. Action testified that when a mixture of DNA profiles is obtained, an expert can only conclude that a specific person is a possible contributor and cannot conclusively state that the person is a contributor. He acknowledged that Special Agent Nelson did not state that the Defendant and the victim were the only contributors but stated that there were at least two contributors to the mixture. He pointed out that there would be more than two contributors to the mixture.

Dr. Action disagreed with Special Agent Nelson's method of examining those loci below the stochastic threshold to ensure that they were consistent with her findings. He maintained that anything below the stochastic threshold cannot be used. He noted a study that concluded that five to ten percent of pathology tests involve mistakes. He stated that a problem of bias in generating and interpreting the tests has been recognized but that the effect of bias could not be determined.

Dr. Action did not independently test the swabs and said he was only asked to review the data and render an opinion. He could not conduct independent testing because he no longer directed a laboratory. He opined that the data from the penile and pubis swabs was inconclusive.

In rebuttal, the State presented the testimony of a victim in another case ("Victim 1") that occurred in Abington Apartments. She stated that on February 9, 2014, she was talking to her boyfriend on the telephone when she heard a noise. Her roommate was not at home, and Victim 1 called out, "[I]s that you?" When no one answered, she ended her telephone conversation and opened her bedroom door. A man was standing at the door and pointing a gun at her. He demanded money and touched her all over her body.

The man remained in the apartment for two and one-half hours. His face was covered, but Victim 1 could see the man's eyes and nose and part of the side of his head. At one point, the man and Victim 1 were involved in a struggle during which the man's hood came down to his lips. Victim 1 identified the Defendant as the perpetrator in a photographic line-up and at trial.

Victim 1 testified that the Defendant took her cellular phone, a chain, a tablet, and cash. She identified a photograph of her cellular phone, which the victim also identified at trial as appearing to be the cellular phone that the Defendant showed her after raping and robbing her. After the Defendant left, Victim 1 ran to another apartment, and the

occupants contacted the police.  She provided the police officers with the number to her cellular phone, and the officers asked her to keep the number active.

On cross-examination, Victim 1 testified that she identified the Defendant in a photographic line-up approximately two months after the invasion.  She asked the officer showing her the line-up to cover a portion of the face of each person in the line-up to assist her in making an identification.  The Defendant was not wearing gloves during the invasion, and Victim 1 did not recall the Defendant having tattoos on his hands.

The State presented the testimony of a victim ("Victim 2") in another case that occurred in Abington Apartments on February 18, 2014.  Victim 2 testified that during the early morning hours, she awoke to a man in her face holding a black pistol.  She later identified the man as the Defendant in a photographic line-up and at trial.  Victim 2 began to hyperventilate, and the Defendant threatened to shoot her son, who was in his bedroom, if she did not quiet down.  She was able to calm herself somewhat.  The Defendant demanded money and asked if she knew "someone."  She told him that she did not know the person and that the only money she had was on her dresser.

The Defendant pulled the sheets off Victim 2 and began fondling her.  He raped her orally multiple times and raped her vaginally while wearing a condom.  He said he wanted to be with her and asked for her telephone number and her Facebook information.  Victim 2 stated that she gave him the information because she believed police officers could utilize the information to apprehend him.  Before leaving, the Defendant begged Victim 2 to not call the police, and she told him that she would not do so.  The Defendant told her that he wanted to contact her so that he could return to her apartment.  Victim 2 believed the Defendant had been in her apartment previously because she noticed that a window in her living room had been broken and then taped back together.

After the Defendant left, Victim 2 fled the apartment with her son and called the police.  While at the Rape Crisis Center, Victim 2 received a call from a "649" number.  The number from Victim 1's cellular phone included "649."  Victim 2 then received a text message from Victim 1's cellular phone number stating, "I though you weren't going to call the police.  I thought I could trust you."

On cross-examination, Victim 2 testified that the Defendant was wearing a ski mask, a hoodie, and a white shirt.  She was able to see his eyes, lips, nose, mustache, and stomach.  She did not notice any tattoos on his hands but said she was not focused on his hands.  The Defendant initially was wearing gloves but later removed them.  Victim 2 acknowledged that she was not certain that the Defendant had been in her apartment previously.

- 12 -

The State recalled Sergeant Mathena, who testified that he and other officers were searching for a white cellular phone in a SUV on the morning of the Defendant's arrest because the cellular phone had been taken during the first sexual assault and calls were still being made from that number. Officers obtained the call records and learned of the cellular tower servicing the calls. They knew that the person making the calls was located within one-half to one mile of the tower. Upon learning that another sexual assault was reported during the early morning hours of March 27, 2014, Sergeant Mathena and other officers began searching for an SUV matching the description of the SUV seen leaving the victim's apartment complex in apartment complexes close to the cellular tower. Sergeant Mathena looked inside the SUVs for a cellular phone. If he saw a cellular phone, he called Victim 1's number to see whether the cellular phone would ring. If it did not ring, he continued his search.

Sergeant Mathena testified that he looked inside the fourth or fifth SUV that he approached and saw a cellular phone. He called Victim 1's number twice, and the cellular phone inside the SUV vibrated and rang both times. Sergeant Mathena and his team watched the SUV until the Defendant approached it.

At the conclusion of the evidence, the jury convicted the Defendant of aggravated rape, aggravated robbery, aggravated burglary, and possession of a firearm with the intent to go armed during the commission of a dangerous felony. The trial court sentenced the Defendant to twenty years for the aggravated rape conviction, ten years for the aggravated robbery conviction, and five years for each of the aggravated burglary and firearm convictions. The trial court ordered that the sentences for aggravated burglary and the firearm conviction run consecutively. The trial court also ordered the sentences for aggravated rape and aggravated robbery run consecutively to each other but concurrently to the sentences for the other convictions for an effective sentence of thirty years. The Defendant appeals.

**ANALYSIS**

**I. Sufficiency**

The Defendant asserts that the evidence presented at trial is insufficient to establish his identity as the perpetrator. The State responds that the evidence is sufficient to establish the Defendant's identity. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal,

"'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As it relates to this case, aggravated rape is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" where "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." T.C.A. § 39-13-502(a)(1). Aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401; -402(a)(1). Aggravated burglary, as charged here, is the entering of a habitation without the owner's consent and with the intent to commit rape. T.C.A. §§ 39-14-402(a)(1); -403(a). Finally, "[i]t is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony," which in this case was aggravated burglary. T.C.A. § 39-17-1324(a), (i)(1)(H).

The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *State v. Strickland*, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The issue of

identity is a question of fact left to the jury as the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

In the present case, the victim identified the Defendant as the perpetrator in both a photographic line-up on the day of the offenses and at trial. While the Defendant's face was covered, the victim could see his eyes, which she described as distinctive. She recognized the Defendant's eyes and voice and recalled that she met him one or two months before the attack, that he called her around twenty times on the day they met, and that he showed up to her apartment unannounced sometime later. When the Defendant left the victim's apartment, he was wearing the victim's black and gold Chanel scarf, which officers recovered at the apartment where the Defendant was staying. Officers also recovered a gun and a cellular phone, both of which the victim recognized as similar to the gun and cellular phone possessed by the Defendant during the attack. DNA consistent with the victim's was found on penile and pubis swabs taken from the Defendant. While the Defendant challenges the credibility of the victim, we reiterate that it was the jury's prerogative, as the trier of fact, to evaluate the credibility of the witnesses, determine the weight given to the witnesses' testimony, and reconcile all conflicts in the evidence. *See Bland*, 958 S.W.2d at 659. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish the Defendant's identity as the perpetrator.

## II. Tennessee Rule of Evidence 404(b)

The Defendant asserts that the trial court's admission of the evidence of other offenses presented by the State in rebuttal violated Tennessee Rule of Evidence 404(b) because the other offenses and the offenses for which the Defendant was on trial were not so similar or unique that they constituted "signature crimes." "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). "Trial courts have been encouraged to take 'a restrictive approach of [Rule] 404(b) … because "other act" evidence carries a significant potential for unfairly influencing a jury.'" *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)). Evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or "contextual background." *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Evidence may be admitted for these purposes if the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If the trial court has substantially complied with the procedure mandated by Rule 404(b), a trial court's decision to admit or exclude evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). If the trial court has failed to substantially comply with the procedural mandates of Rule 404(b), our standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53).

Prior to trial, the State filed a notice of its intent to use evidence of other robberies and sexual offenses committed by the Defendant against Victims 1 and 2 and another victim as proof of identity, intent, and lack of mistake or accident. The State maintained that the similarities in the commission of the offenses were so unique as to constitute signature crimes. The Defendant filed a response in which he acknowledged that identity was at issue but maintained that the offenses were not signature crimes. During a jury-out hearing on the morning of the trial, the State announced that it was not seeking to introduce evidence of the offenses against the third victim. The State presented testimony of Victims 1 and 2 and Sergeant Mathena regarding the other sexual offenses and robberies.[1] The State argued that the evidence was probative to the issue of identity because there was evidence linking the three criminal episodes in that the Defendant utilized the cellular phone taken from Victim 1 during the commission of the offenses against the victim of the charged offenses and Victim 2. The State requested that it be allowed to present the evidence in rebuttal in the event that the Defendant presents a DNA expert at trial attacking the DNA evidence. The trial court stated that it would wait until the parties presented their proof at trial to render a ruling.

---

[1] During the jury-out hearing, the State also presented the testimony of Special Agent Nelson that the Defendant's DNA was found on the swabs in the rape kit from Victim 2. The State did not present this testimony at trial.

- 16 -

After Dr. Action testified at trial, the trial court held a jury-out hearing during which it found that identity has been raised as an issue at trial and that the State had established the offenses against Victim 1 and Victim 2 by clear and convincing evidence. The trial court found that the evidence was probative due to the interlocking physical evidence that tied the Defendant to the case and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. We conclude that the trial court substantially complied with the requirements of Rule 404(b) and that, therefore, we review the trial court's findings for abuse of discretion.

The Defendant conceded in the trial court that identity was a material issue at trial. On appeal, he does not challenge the trial court's finding that the State established his commission of the other rapes by clear and convincing evidence. Rather, the Defendant contends that the trial court erred in admitting the evidence because the offenses do not constitute signature crimes. *See, e.g. Jones*, 450 S.W.3d at 895 (providing for the admission of evidence of other crimes on the issue of identity where the defendant "used a peculiar and distinctive method in committing the crimes"); *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999) (providing that multiple offenses reveal a distinctive design and, thus, give rise to an inference of identity where "the modus operandi [is] so unique and distinctive as to be like a signature" (quoting *State v. Carter*, 714 S.W.2d 241, 245 (Tenn. 1986)).

The trial court, however, did not admit the evidence on the basis of signature crimes. Rather, the trial court admitted the evidence on the basis that the cellular phone was linked to all three criminal episodes, which is a completely different basis upon which to admit evidence of other bad acts when the material issue is identity. *See, e.g. State v. Howell*, 868 S.W.2d 238, 254-55 (Tenn. 1993) (holding that in a murder trial, the trial court properly admitted evidence of a subsequent robbery and shooting in Oklahoma and a shoot-out with police in Florida when the defendant used the same gun in all three offenses, the defendant utilized the same vehicle in the Tennessee and Oklahoma offenses, and the shoot-out in Florida established flight); *State v. Dominique Greer*, No. E2015-00922-CCA-R3-CD, 2017 WL 2233647, at *13 (Tenn. Crim. App. May 17, 2017), *no perm. app. filed* (holding that in a felony murder trial, the trial court properly admitted evidence of a prior aggravated robbery of a separate victim during which the defendant took the victim's cellular phone and wallet when the defendant utilized the cellular phone in the commission of the felony murder and left the robbery victim's wallet in the location where the defendant told a witness he had hidden the gun); *State v. Brandon Churchman*, No. W2013-00175-CCA-R3-CD, 2014 WL 12651043, at *9-10 (Tenn. Crim. App. Apr. 28, 2014) (concluding that in a felony murder trial, the trial court properly admitted evidence of a prior aggravated robbery and attempted murder of a separate victim during which the defendant took the victim's distinctive vehicle and shot

him when the defendant utilized the same gun and the distinctive vehicle in committing the felony murder).

Because the trial court did not admit the evidence based upon signature crimes, the issue of whether the offenses constituted signature crimes is not before this court. Moreover, on appeal, the Defendant does not challenge the trial court's finding of interlocking evidence as a basis for admission of evidence of the offenses against Victims 1 and 2. Accordingly, the Defendant has failed to establish that the trial court erred in admitting the evidence, and, therefore, he is not entitled to relief on this issue.

### III. Sentence for Firearms Conviction

Although not raised by the parties, we conclude that the trial court erred in imposing a five-year sentence as the mandatory minimum sentence for the Defendant's conviction for possession of a firearm with the intent to go armed during the commission of a dangerous felony. This firearm offense is a Class D felony with a mandatory minimum sentence of three years in the Tennessee Department of Correction. *See* T.C.A. § 39-17-1324(a), (g)(1). The conviction carries a mandatory minimum sentence of five years if the defendant had a prior felony conviction at the time of the offense. *See* T.C.A. § 39-17-1324(g)(2). However, where the State is seeking to have the defendant sentenced under subsection (g)(2) to the mandatory minimum five-year sentence, "the trier of fact shall first determine whether the person possessed or employed a firearm. If the trier of fact finds in the affirmative, proof of a qualifying prior felony conviction pursuant to this section shall then be presented to the trier of fact." T.C.A. § 39-17-1324(f). This section requires a bifurcated hearing and a jury determination as to the prior felony conviction. *State v. Mark Brian Dobson*, No. M2015-00818-CCA-R3-CD, 2016 WL 7212574, at *15 (Tenn. Crim. App. Dec. 13, 2016), *perm. app. denied* (Tenn. Feb. 24, 2017).

The trial court sentenced the Defendant to five years as the mandatory minimum sentence upon finding that the Defendant had a prior felony conviction. However, the State never sought a bifurcated hearing and a jury determination as to the prior felony conviction. Thus, the Defendant's five-year sentence contravenes section 39-17-1324(f). The five-year sentence was outside the Defendant's sentencing range of two to four years as a Range I offender convicted of a Class D felony, and the Defendant was subject to only a mandatory minimum sentence of three years. *See* T.C.A. §§ 39-17-1324(a), (g)(1), 40-35-112(a)(4). Therefore, we reverse the Defendant's sentence for the firearm conviction and remand the case to the trial court for a new sentencing hearing on the firearm conviction.

## CONCLUSION

We conclude that the Defendant is not entitled to relief from his convictions for aggravated rape, aggravated robbery, aggravated burglary, and possession of a firearm with the intent to go armed during the commission of a dangerous felony. We reverse the Defendant's sentence on the firearm conviction and remand for a new sentencing hearing for that conviction. The trial court's judgments are otherwise affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE